Carl E. HEMPEL, et ux *v.* Dewayne BRAGG and Black, Corley & Owens, P.A.

92-1176 856 S.W.2d 293

Supreme Court of Arkansas
Opinion delivered June 21, 1993
[Rehearing denied September 13, 1993.]

*Charles A. Brown, Jr.*, for appellants.

*Wright, Lindsey & Jennings*, for appellees.

ROBERT H. DUDLEY, Justice. The general contractor on a home construction project filed suit against the owners of the home for a progress payment that was due under the terms of the contract. The owners filed a counterclaim against the contractor and a third-party complaint against the architects who designed the home. The chancellor decided all of the issues in favor of the general contractor and the architects. We affirm all of the rulings of the chancellor, except one that awarded the architects the balance of their fee, and we reverse that one ruling because the architects did not file a counterclaim or ask for any affirmative relief.

The facts, viewed in the light most favorable to the appellees, as we must do, are as follows. In early 1990, appellants, Carl and Betty Jo Hempel, decided to build an expensive home in the Hidden Valley Estates subdivision in Benton. On June 12, 1990, they hired the appellee architectural firm of Black, Corley and Owens to provide the architectural services. They filled in the blanks on a form entitled "American Institute of Architects Owner-Architect Agreement." Under the express terms of the agreement the owners were to "furnish surveys describing the physical characteristics, legal limitations and utility locations for the site of the Project, and a written legal description of the site. The surveys and legal information shall include . . . boundaries and contours of the sites. . . ." In short, it was the duty of the owners to provide the architects with a boundary survey and a topographical survey of the lots on which the house was to be located. The owners provided a copy of the recorded plat of the subdivision, but, unfortunately, it was based on an earlier erroneous survey made for the subdivision developer. In addition to the plat based on the erroneous survey, owner Carl Hempel showed one of the architects the erroneous north boundary line of the lots, showed the architect survey pins that erroneously divided his lots from the neighbor's lot, and said his lot extended to the pins which were on the line maintained by a neighbor. The architect relied on the plat, survey pins, maintained line, and statements of the owner as establishing the boundaries of the lots. The owners did not provide a topographical survey. On June 13 and 14, the architects used the boundaries given them to set out stakes and shoot elevation levels on the lots. That information was

then taken back to their offices where it was overlaid on the boundary survey and developed into a topographical survey. The purpose of the topographical survey was to show the building contractor where and how to locate the house on the lots and to show the excavation contractor where to remove and move soil. Ultimately, the erroneous boundaries supplied by the owners to the architects caused the topographical survey to be in error. In August the owners supplied the architects with a copy of the erroneous survey that they had acquired at the time they purchased the lots from the developer of the subdivision. The survey shows a "pin" and "one iron pin" that are the pins the architects had located earlier, and they were at the precise location they are supposed to be according to the survey the owners gave the architects.

The owners chose the low bidder, appellee Dewayne Bragg, to be the general contractor for the project, and in January 1991 the owners and Bragg signed a form entitled "American Institute of Architects Owners-Builders Contract." In February 1991, as the contractor was shooting levels and staking out the house on the partially cleared lots, he found that the elevations at the rear of the lots were not as depicted on the topographical survey. He notified the architects, and the architects decided that modifications would have to be made in the plans in order to keep the house at the elevation planned. The changes required additional excavation work in a courtyard area, a lengthening of the driveway, and an extension of a retaining wall. The architects did not notify the owners of the changes at the time because the owners were in Minnesota, and the architects did not think the modifications affected either the function or aesthetics of the home. A part of the owner-architect contract provides: "The architect's decision on matters relating to aesthetic effects will be final as consistent with the intent expressed in the contract." At this time the architects had not discovered that the topographical survey error was a result of the error in the plat and survey supplied by the owners, but instead thought the error was due to some unknown mistake of their own. Consequently, the architects told the owners that they would pay the additional expense caused by their mistake, and owner Carl Hempel responded that he was "not going to stick it to me [the architect] for that." It was only after this suit was filed that the architects discovered the true

cause of the error in their topographical survey, and, after discovering that cause, they testified that they did not feel they owed the additional expenses. The architects testified, and the trial court found, that the architects explained the modifications to the owners immediately upon their return to Benton.

The owners made no objection to the recommended remedial excavation, to the lengthening of the driveway, or to the extension of the retaining wall. Beginning on March 22, 1991, the owners visited the construction site from time to time. They were present when the floor slabs were poured. They took video recordings of the construction. They paid a progress payment submitted by the contractor on April 10, 1991. They paid another progress payment on May 5, 1991. During all of this period they never said anything about the changes in the excavation, to the lengthening of the driveway, or to the extension of the retaining wall. On June 5, 1991, the owners refused to pay the third requested progress payment and stated that the reason was, in part, because of the errors the architects made in the topographical survey.

Since he was not paid the progress payment, the contractor ceased work on June 17, 1991, and filed suit against the owners on July 9, 1991, for the amount due. He also asked that a material-man's lien be imposed and, if not satisfied, for foreclosure of the lien. The owners filed a counterclaim against the contractor and pleaded that he breached their contract by not informing them of the survey errors and the resulting changes. The owners additionally filed a cross-complaint against the architects and pleaded that they had breached their contract by not informing them of the changes and that they were guilty of negligence in performing the topographical survey. After a five-day trial the chancellor, on disputed facts, found in favor of the architects and the contractor. The chancellor found that the architects were not guilty of negligence in relying on the plat, survey pins, and established property line in the preparation of the topographical survey and did not breach their contract with the owners because the architects informed the owners of the changes as soon as reasonably practical and the owners, without comment, allowed the construction with the changes to continue. The chancellor found that the contractor had not breached his contract, and that under the terms of the contract, the contractor was entitled to $112,936.00 plus interest at the rate of 10%, plus costs, and

attorneys' fees. The chancellor further ruled that the pleadings should be amended to conform to the proof and awarded the $900.00 remaining due to the architects under their contract with the owners. There were various posttrial motions, and the ones that become material to this opinion are set out as they are discussed.

The appellant owners' primary argument on appeal is that the chancellor erred in his finding of facts. The owners ask us to reverse the judgments in favor of the architects and contractor and instead to award judgments to them against the architects and contractors. They divide this part of the argument in their brief into three separate points of appeal, with one of the points being subdivided into five subpoints, and both points having many additional untitled subarguments. We treat all of the arguments involving the findings of fact in this one part of our opinion. As a preliminary matter, we note that the chancellor heard all of the testimony, weighed that testimony, addressed the owners' arguments, and found the disputed facts against the owners. We must give due deference to the superior position of the chancellor, and we will not reverse the findings of the chancellor unless they are clearly erroneous. *Magnolia Sch. Dist. No. 14* v. *Arkansas State Bd. of Educ.*, 303 Ark. 666, 799 S.W.2d 791 (1990). We cannot say that any one of the findings of fact that determines the outcome of this case was clearly erroneous.

The first of these arguments about the findings of fact is that the chancellor erred by failing to find that the architects were negligent in their preparation of the topographical survey. Viewing the evidence most favorably to the appellees, the architects relied on the plat furnished by the owners and relied on statements made by the owners about the location of the boundary line, then confirmed the correctness of the plat and of the owners' statements by finding established survey pins and observing the maintained property line, and later confirmed the plat with the survey furnished by the owners. We cannot say the chancellor erred in finding that the architects were entitled to rely on the accuracy of so many concurring factors.

The owners argue that the chancellor erred in finding the architects were not liable for breach of contract because the owners waived the changes in the plans. Their argument is

partially based on their factual argument that they did not know about the changes and therefore could not have waived the contractual agreement requiring a written change order. The testimony was in direct conflict on this issue. The chancellor found that the owners "were made aware by" the architects "of the situation as soon as practical." The chancellor also found that the owners "knew of the said situation in the early stages of construction and allowed same to continue through a substantial portion of the construction and waived any right to complain thereof." There was direct testimony from which the chancellor could make such findings.

 The owners additionally argue that the chancellor erred in finding a waiver of the changes made by the architects because paragraph 13.4.2 of the contract contains a provision that "[n]o failure to act . . . shall constitute a waiver of a right . . . under this contract, nor shall . . . failure to act constitute approval . . . except as may be agreed in writing," and the waiver by the owners of the changes made by the architects was not in writing. The argument is without merit for either of two reasons. First, the paragraph cited by the appellant owners as not allowing a waiver unless it is in writing, paragraph 13.4.2, is from a paragraph in the A.I.A. "General Conditions of the Contract for Construction," which in turn is a part of the A.I.A. "Standard Form of Agreement Between Owner and Contractor." However, the cited paragraph is not a part of the contract between the owners and the architects. Second, the general rule of law applicable to these facts is set out in American Jurisprudence 2d as follows:

> Although stipulations in building or construction contracts requiring written orders or agreements for extra work or alterations are valid and binding so long as they remain in effect, it is equally well settled that they may be avoided by the parties to the contract. The courts have adopted various theories of avoidance, which may be classified as those of independent contract, modification or rescission, waiver, and estoppel.
>
> A waiver of such stipulation by the owner is the theory on which it is most frequently avoided. Among the acts or conduct amounting to waiver are the owner's knowledge

of, agreement to, or acquiescence in, such extra work, a course of dealing which repeatedly disregards such stipulation, and a promise to pay for extra work, orally requested by the owner and performed in reliance on that promise.

13 Am. Jur. 2d *Building and Construction Contracts* § 24 (1964) (footnotes omitted).

While we have not been cited a case of our own with a holding directly in point, our case of *U.S. Rubber Co.* v. *Northern*, 236 Ark. 381, 366 S.W.2d 186 (1963), implies that we would follow the general rule if presented with the requisite facts. *See also Rad-Razorback Ltd. Partnership* v. *B.G. Coney Co.*, 289 Ark. 550, 713 S.W.2d 462 (1986).

The appellant owners make an additional number of arguments about the findings concerning the contractor. They contend that the chancellor erred in finding that the contractor built the home according to the plans and in finding that he built the home in a workmanlike manner. We need not detail all of the testimony on these issues. The architects testified the contractor built the house according to the plans, and the contractor testified to the same. An independent architect testified the plans were "first class," and an independent builder testified that the quality of the construction, the material, and workmanship were "excellent" and "as good as we can get." The owners contend that the evidence did not support the amount of the contractor's judgment, $112,936.00. The contractor testified this amount represented the cost of materials and labor he supplied to the job, plus his profit. We cannot say an award of this amount was clearly erroneous.

After the chancellor rendered his findings of fact and conclusions of law and had caused a judgment to be entered, the owners filed a "Motion for Special Findings of Fact and Conclusions of Law." The motion was, in substance, a set of interrogatories that the owners propounded to the chancellor. The chancellor refused to answer the interrogatories. The owners contend the refusal to answer their questions amounts to reversible error. The chancellor's original findings of fact constituted an adequate explanation of the ruling in accordance with A.R.C.P. Rule 52, and we certainly will not require that a trial judge answer all questions that might be propounded by a losing party.

The appellant owners make other arguments about other findings of fact, but it is not necessary for us to address those arguments. An example is the chancellor found the changes were "insubstantial." The owners argue that they were, in fact, substantial changes. There is no reason for this court to decide the issue because, whether substantial or insubstantial, the owners knew about them and tacitly approved them.

■ The owners argue that the chancellor erred as a matter of law by attaching a materialman's lien to their property for the value of some materials that were purchased for the home, but are stored off-site. *See Meek* v. *Parker*, 63 Ark. 367, 38 S.W. 900 (1897). The owners admit the point "may be somewhat irrelevant." The owners have posted a supersedeas bond for the entire amount of the judgment, including any amounts that would not be subject to the materialman's lien, and, consequently, neither the materialman's lien nor the judgment lien will be foreclosed. Since the point is moot, we do not address it.

■ The appellant owners' next assignment of error is that the chancellor erred by awarding excessive attorneys' fees to the architects and the contractor. The crux of the argument is that the awards for attorney fees included some items of expense that were not properly allowable. This is an assignment of error that we cannot reach because the record does not contain the proof that was before the trial judge when he decided the matter. The motions and rulings which are in the record indicate that the architects' attorney and the contractor's attorney mailed itemized statements of fees to the owners' attorney, but those itemized statements are not in the record. The owners' attorney filed a response after receiving the itemized statements, which is in the record, and set out objections to some specific items as not being allowable. Later, the chancellor apparently had before him the itemized statements, but made the fee awards in gross. The order reflects only that the attorney for the contractor was awarded $11,725.00, plus $73.01 costs, and the attorneys for the architects were awarded a fee of $26,484.00. The owners do not object to the costs awarded to the contractor's attorney. We have no way of knowing the original amounts requested by the attorneys, or what specific items of expense might have been included in the final gross award, and, as a result, cannot address the assignment of error.

The owners' next point of appeal involves the rate of post judgment interest awarded. The chancellor awarded ten percent interest. The owners filed a "Motion to Amend the Findings and Amend the Judgement" which, in material part, provides:

> Paragraph 5 is objected to as being the wrong conclusion of law and fact, and more specifically objected to because the post-judgment interest on an action *ex contractu* is contrary to the Arkansas Constitution in that the 10% interest rate per annum exceeds the Constitutional Usury Limitations on the date this judgment is to be entered. Article 19, Sec. 13, Arkansas Constitution.

The cited constitutional provision provides that interest on a contract shall not be more than five percent above the Federal Reserve Discount Rate. In their brief the owners ask us to take judicial notice of the fact that, on the date the judgments were entered, the discount rate was three and one-half percent. As a result, the owners argue that the rate set by the chancellor was excessive by one and one-half percent. We decline to reverse on the point. The chancellor was never informed that the applicable discount rate was three and one-half percent, nor was he asked to take judicial notice of the fact. Rule 201 of the Arkansas Rules of Evidence provides that it is discretionary whether a court takes judicial notice of some adjudicative fact when the parties do not mention the matter. It is only mandatory that a court take judicial notice if requested by a party and supplied with the necessary information. The appellants cite no cases to us that would cause us to reverse a trial court for failing to take judicial notice of some adjudicative fact that was not brought to the trial court's attention.

The last of the owners' arguments that we find necessary to address is one that has merit. After being sued by the contractor, the owners filed a cross-complaint against the architects. The architects filed an answer and pleaded affirmative defenses, but never filed a counterclaim against the owners. During the contested five-day trial, the attorney for the owners introduced into evidence, on two different occasions, the architects' bill for services rendered. The architects were questioned about the amount of their bill, and the proof showed that the architects claimed that the owners still owed them $900.00 for

services rendered. The architects' attorneys did not move to have the pleadings conform to the proof. *See* A.R.C.P. Rule 15(b). Even so, the chancellor awarded the architects a judgment of $900.00 against the owners. We reverse that award. The applicable part of Rule 15(b) provides:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of either party at any time, even after judgment; but failure to so amend does not affect the result of the trial of those issues.

As noted by the court of appeals in *Shinn* v. *1st Nat'l Bank of Hope*, 270 Ark. 774, 606 S.W.2d 154 (Ark. App. 1980), this rule has been interpreted as permitting a defendant to raise a counterclaim, even after judgment, but the cases permitting it have done so only where it was clear that all of the relevant evidence was in the record, or the issue was clearly one the parties contemplated as being before the court. Here, the evidence clearly established that the architects claimed this amount was due them, but it does not appear that the owners contemplated the issue as being before the court, as evidenced by the fact that they did not cross-examine the architects about the reasonableness of the amount. Since there was no motion to have the pleadings conform to the proof, no indication that the architects were seeking this amount, and it does not appear that the parties contemplated the issue as being before the court, we hold that the trial court abused its discretion in awarding this particular judgment to the architects. Accordingly, we reverse the award of the $900.00 judgment to the architects. We do not remand or dismiss this claim, since it has never been pleaded, and we make no determination about whether it constituted a compulsory counterclaim. *See* A.R.C.P. Rule 13.

Affirmed in part, reversed in part.